ALFONSO LASTRA CHÁRRIEZ, Petitioner and Appellee, EX PARTE; THE PEOPLE OF PUERTO RICO, Appellant.

No. 7954. Argued June 19, 1939.—Decided April 25, 1940.

R. A. Gómez, Prosecuting Attorney, and Luis Janer, Assistant Prosecuting Attorney, for appellant. J. Ramírez Santibáñez, Antonio Reyes Delgado, Angel Marchand Paz, Lionel Fernández Méndez and Dubón & Ochoteco for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

Judge Romany of the District Court of San Juan sentenced Attorney Alfonso Lastra Chárriez to pay a $5.00 fine and to 15 days in jail for an alleged offense of contempt committed in his presence. The aggrieved party appealed to Justice Travieso of this court on a writ of habeas corpus and secured the setting aside of the judgment and the proper order immediately setting him free. The People of Puerto Rico appealed from the judgment rendered by Justice Travieso to the full court. In support of its appeal the appellant assigns the following errors:

"1. To allow the petitioner to explain 'what he meant and his state of mind during the incident which brought about his conviction

of contempt,' seeking by said statement to rebut the facts stated in the judgment rendered by the trial court, and to take into account said statement from the petitioner regarding his intention and his state of mind in order to conclude that the petitioner was not guilty of contempt.

"2. To hold that there was a *material discrepancy* between the recital of the facts in the judgment and the stenographic transcript of the incident which forms part of said judgment, reaching the conclusion that the petitioner had not 'interrupted' the trial judge.

"3. To hold that the facts stated in the judgment do not constitute contempt."

On the 19th of last June, the day set for the hearing of the appeal, the appellee filed a motion in which he asked us to dismiss the appeal brought by The People of Puerto Rico on the ground that this court was without jurisdiction to take cognizance of the appeal. The alleged lack of jurisdiction consists in:

"A. That the notice of appeal in the instant case was filed by The People of Puerto Rico and that the prosecuting attorney (fiscal) of this court does not represent, under the provisions of the Organic Act of Puerto Rico, the People of Puerto Rico which is represented solely and exclusively by the Attorney General of Puerto Rico, and therefore the representation improperly assumed by the prosecuting attorney (fiscal) of this court in the present case is void and of no effect.

"B. That assuming that the prosecuting attorney (fiscal) of this court is vested with the representation of The People of Puerto Rico, the latter, notwithstanding the provisions of section 1 and 2 of the Act of March 12, 1903, (Comp. sections 6547–6548), is not entitled to appeal from an order discharging a defendant unlawfully deprived of his liberty.

"C. That assuming that an appeal should lie, under the law, from an order discharging the petitioner and appellee on the ground that he had been unlawfully deprived of his liberty, inasmuch as the present habeas corpus petition had been directed to Andrés Lugo as warden of the district jail of San Juan, said Andrés Lugo, in such capacity, is an aggrieved party and being such a party the notice of appeal should have been served on said Andrés Lugo, in his aforesaid capacity, and as he was not served with said notice of appeal, and said Andrés Lugo being, in his capacity as warden of the district

jail of San Juan, an aggrieved or prejudiced party in this proceeding, this court is without jurisdiction to take cognizance of this proceeding.''

The nature of the questions raised by the appellee requires from us their discussion at the start, for if all or either of them were to prosper we would be excused from considering the appeal on its merits.

■ (A) We can not agree with the appellee that the representation of The People of Puerto Rico before this court is vested ''solely and exclusively in the Attorney General of Puerto Rico.'' Section 14 of our Organic Act finally settles the point by stating that the Attorney General *"shall be responsible for the proper representation of the people of Puerto Rico* or its duly constituted officers in all actions and proceedings, civil or criminal, in the Supreme Court of Puerto Rico in which the people of Puerto Rico shall be interested or a party, . . .'' The responsibility imposed by the above provision on the Attorney General does not necessarily mean that he should be the only person who, to the exclusion of any other attorney, could assume such representation. His duties are confined to see to it that the people of Puerto Rico is duly represented in any proceeding before this court regarding any matter in which the people of Puerto Rico or any of its duly constituted officers shall be interested. Obviously, such duty can be fully performed by the Attorney General by assuming the legal representation personally or through his assistants, among which may be included the prosecuting attorney (*Fiscal*) of this court.

■ (B) There is in the United States a marked conflict of authorities regarding the right of appeal from final orders or judgments rendered in habeas corpus proceedings. The weight of authorities at Common Law is to the effect that a judgment in habeas corpus proceedings discharging a prisoner can not be reviewed by the state or by any public officer. See the monographs in 10 A.L.R. 385, 386, and 30 A.L.R. 1322. But this rule at Common Law has been super-

seded by statutory provision in many States, by creating the right of review either by writ of error or appeal, both in favor of the person deprived of his liberty and of the State or its officers. It was not until 1927 that California enacted section 1506 of the Penal Code pursuant to which the State was granted the right of appeal from an order or judgment in habeas corpus whereby a man under custody has been released. In New York, first under section 2059 of the Code of Civil Procedure and later on under section 1275 of the Civil Practice Act, the right of appeal has been upheld in habeas corpus proceedings in favor of both, the State and the prisoner. See the interesting opinion of the New York Court of Appeals, delivered by its then Chief Justice Cardozo, in *People ex rel. Sabatino* v. *Jennings,* 63 A.L.R. 1458, 246 N.Y. 258, 158 N.E. 613.

Our Code of Criminal Procedure, which, as provided by law, did not begin to take effect until July 1, 1902, established the writ of habeas corpus by sections 469 to 500 both inclusive. Nothing was provided, however, as to the right of appeal from orders or judgments to be rendered in this proceeding. It was a year after the enactment of the above Code, by the Act of March 12, 1903, (Code of Criminal Procedure, p. 328, 1935 ed.), that our Legislature established and regulated in every detail the right of appeal in habeas corpus proceedings, making the same available to the prisoner where his release is denied as well as to the People of Puerto Rico where the prisoner is discharged or released on bail. Therefore, our Legislature, acting ahead of that of California, by enacting said Act of March 12, 1903, closed the doors to any controversy regarding the right of the People of Puerto Rico to appeal from final judgments or orders entered in habeas corpus proceedings.

Appellee maintains that notwithstanding the provisions of the Act just cited, The People of Puerto Rico is not entitled to appeal from a decision in habeas corpus proceedings ordering the discharge of the prisoner. The clear-

ness of the legal provision in question justifies our assumption that the contention of the appellees rests upon the alleged unconstitutionality of such part of the law as grants the right of appeal to the People of Puerto Rico. He fails, however, to cite any authority in support of said contention and the question is now raised for the first time in this jurisdiction. It is only in California, that we know of, that the constitutionality of a provision similar to ours has been challenged. The constitutionality was challenged of section 1506 of the Penal Code which, among other provisions, confers on the State in certain cases the right of appeal in habeas corpus proceedings. The challenge was mainly based on certain power of regulation granted by section 1506, *supra,* on the Judicial Council in connection with the writ of habeas corpus. The validity of the power conferred on the Judicial Council was upheld on the ground that, although the Legislature could not prohibit the writ of habeas corpus for, if it did, it would violate the constitutional provision which guarantees it, no constitutional provision bars the regulation of the procedure. *In re Alpine,* 203 Cal. 731, 745; 58 A.L.R. 1500.

The same might be said regarding the power of our Legislature to confer the right of appeal upon the Government. Section 2 of the Organic Act forbids the suspension of the privilege of the writ of habeas corpus, but fails to contain any other provision prohibiting the Legislature from regulating the power.

██ In view of the civil nature of the writ of habeas corpus, we fail to see how a declaration of unconstitutionality might be made regarding a statute which, like ours and those of several States, confers the right of appeal on the Government in habeas corpus proceedings. Treating of the nature of the writ of habeas corpus, the Supreme Court of the United States expressed itself as follows:

"The writ of habeas corpus is the remedy which the law gives for the enforcement of the civil right of personal liberty. Resort to

it sometimes becomes necessary, because of what is done to enforce law for the punishment of crimes, but the judicial proceeding under it is not to inquire into the criminal act which is complained of, but into the right to liberty notwithstanding the act. Proceedings to enforce civil rights are civil proceedings, and proceedings for the punishment of crimes are criminal proceedings. In the present case the petitioner is held under criminal process. The prosecution against him is a criminal prosecution, but the writ of habeas corpus which he has obtained is not a proceeding in that prosecution. On the contrary, it is a new suit brought by him to enforce a civil right, which he claims, as against those who are holding him in custody, under the criminal process. If he fails to establish his right to his liberty, he may be detained for trial for the offence; but if he succeeds he must be discharged from custody. The proceeding is one instituted by himself for his liberty, not by the government to punish him for his crime." *Ex parte Tom Tong*, 108 U. S. 556; 27 L. ed. 826.

Chief Justice Marshall expressed himself to the same effect as follows:

". . . . The question whether the individual shall be imprisoned, is always distinct from the question whether he shall be convicted or acquitted of the charge on which he is to be tried, and therefore, these questions are separate, and may be decided in different courts . . ." *Ex parte Bollman & Swartwout*, 4 Cranch 75–101.

As the habeas corpus proceeding is of a civil nature and entirely independent of and foreign to the delinquent act which was the cause of the imprisonment, the law granting the right of appeal to the People of Puerto Rico can not conflict with such part of section 2 of our Organic Act which guarantees to persons the right not to be put twice in jeopardy for the same offense, a constitutional provision which was no doubt borne in mind by appellee when alleging the unconstitutionality of the law in controversy. Obviously, as the writ of habeas corpus is a remedy purely of a civil nature and foreign to the offense which caused the imprisonment of the petitioner, it can not be successfully maintained that by appealing from the judgment releasing him from

custody on habeas corpus, petitioner is being put twice in jeopardy for the same offense.

(C) It remains now for us to consider the third and last of the questions raised in the motion to dismiss, which reduces itself to a determination of whether the People of Puerto Rico, in order to perfect its appeal in habeas corpus proceedings, should necessarily serve notice thereof on the officer holding the prisoner in custody.

It is true that under section 1 of the Act of March 12, 1903, under consideration, an appeal may be taken to the Supreme Court of Puerto Rico by *"any party to the proceedings, aggrieved thereby."* Can the officer having custody of the prisoner be considered as an aggrieved party? This is the question to be determined. Section 2 of the act referred to dispels any doubt that might be entertained by reason of the vagueness of the language of section 1 thereof, conferring the right of appeal upon the People of Puerto Rico and empowering the district attorney of the proper district, the prosecuting attorney (*Fiscal*) of the Supreme Court, the Attorney General, or any attorney duly authorized by the latter, to take the appeal. By omitting the name of the warden of the jail such right was obviously excluded. *Expressio unius est exclusio alterius.*

Construing a legal provision similar to that contained in section 1 of the act in question, it has been held that the phrase *"aggrieved party"* does not include the officer who had the custody of the prisoner released on habeas corpus, it being held moreover that said officer is not entitled to appeal. *Burr* v. *Foster,* 132 Ala. 41, 31 So. 495; *Re Quinn,* 37 N. Y. Supp. 534; *Re Baker,* 56 Vt. 1. It is evident that if the warden of the jail is not entitled to appeal, not being a party interested or aggrieved by the order or judgment whereby the prisoner was released, he is not interested either in requiring service of notice for the perfection of any appeal that might be taken by the People.

■■ The three jurisdictional questions raised by the appellee in his motion to dismiss having been decided adversely to him, we will proceed now to a consideration of the errors assigned by the appellant. We will invert the order of the errors as assigned, by taking up first the third and last of them, for, should the conduct of appellee constitute contempt, as charged in the warrant of arrest, it will be unnecessary to consider the first two assignments.

The incident that gave rise to the judgment for contempt happened while impaneling a jury in a case where Attorney Lastra represented the accused. We will now transcribe the judgment of the district court from which appears the conduct of the petitioner which was held to constitute contempt:

"Whereas, on this day Santiago Ramos was being tried for murder;

"Whereas, in open court and during the examination of the member of the jury Saldaña who alleged to be sick although this presiding judge constantly and frequently saw him about the streets of San Juan;

"Whereas, while the court was considering the request of juror Saldaña, counsel for the defendant, attorney Alfonso Lastra Chárriez, interrupted the court whereupon this judge told him not to interrupt the court;

"Whereas, the court then ordered attorney Lastra to sit down in his place;

"Whereas, attorney Lastra disobeyed the order of the court;

"Whereas, the court insisted on attorney Lastra taking his seat in court, but the latter fully disobeyed the order of the court;

"Whereas, the court first meant to and did fine him $5.00 as a reminder of his duty to obey the orders of the court, to take his seat in court:

"Whereas, the court requested attorney Lastra to please sit down but he refused and disobeyed the order of the court;

"Whereas, it is the opinion of this court that this is a disrespectful conduct which tends to disturb the orderly proceedings in court;

"Whereas, the incident above referred to, as taken from the stenographic record, occurred as follows:

"'The court: Any peremptory challenges from the prosecution?

"'Dist. Attorney: None.

" 'Court: Any peremptory challenges from the defense?

" 'Attorney Lastra: None.

" 'The court: The jury is accepted. Let the jurors be finally sworn.

" .(The jurors were not finally sworn.)

" 'A juror (Manuel Saldaña Crosas) : I pray the court to exempt me on account of illness.

" 'The court: The court regrets very much to refuse the request of Mr. Saldaña. The court has seen Mr. Saldaña in person everywhere about San Juan and sees him constantly and daily. The court wishes to warn the gentlemen of the jury that it is becoming and has become quite necessary for juries to be made up of distinguished citizens who are a credit to the administration of justice. It is a civil duty to cooperate with the administration of justice and he fails in his duties as a citizen who on flimsy grounds seeks to evade such responsibity. The responsibility of the court is great in select-ing the persons who must appear to serve on juries. The court is sorry and knows that Mr. Saldaña goes about San Juan and has seen him in San Juan at different places. The court will not excuse Mr. Saldaña. This point is already disposed of and Mr. Saldaña, please sit down.

" 'Mr. Saldaña: Even though I bring evidence?

" 'The court: Sit down, Mr. Saldaña.

" 'Mr. Saldaña: May I make another remark not connected with any illness? I ask Your Honor to excuse me from jury duty because I do not believe in the institution of the jury.

" 'Attorney Lastra: With leave of the court.

" 'No, just a moment.

" 'Attorney Lastra: There are interests which I represent. I want to state that this atorney represents a defendant and that de-fendant's interest is to have justice done, and that this **gentleman** of the jury might get sick two or three days after the case is being tried and the jury might have to be dissolved on account of such illness, thus prejudicing the interests of the defendant, and I respect-fully move that this gentleman should be excused from jury duty on account of illness.

" 'Because of such fact the court is not going to excuse him.

" 'Attorney Lastra: I take exception.

" 'The court: A juror who states that he does not believe in the institution of the jury is morally barred from jury duty. The court

orders that Mr. Saldaña be stricken out permanently from the jury list. You may withdraw.

" 'Mr. Saldaña: Thanks, Your Honor.

" 'The court: Bring another juror. Was he sworn?

" 'Attorney Lastra: He was.

" 'The court: Will attorney Lastra sit down in his place? The court desires attorney Lastra to sit down in his place.

" 'Attorney Lastra: My answer to the court is that I do not sit down because I do not feel like sitting down, meaning no disrespect.

" 'The court: The court orders you to sit down.

" 'Attorney Lastra: Well, I refuse.

" 'The court: The court fines you $5 for contempt. Attorney Lastra, sit down.

" 'Attorney Lastra: I will not sit down.

" 'The court: Fifteen days in jail for contempt. Marshal, arrest the attorney.'

"Therefore, the court orders that attorney Alfonso Lastra Chárriez pay a $5 fine and be confined fifteen days in jail for contempt in open court."

We agree with appellee that when Attorney Lastra interrupted the court to request that Juror Saldaña be excused from jury duty on account of illness he was acting lawfully in the performance of his professional duty toward his client. This being so, it can not be lawfully held that such interruption disturbed the proceedings in court, just as he would not have disturbed the proceedings if the interruption had been made to take an exception or to enforce any other of defendant's rights. As properly alleged by appellee, after the natural exhaustion from two or three days of jury duty, the illness pleaded by juror Saldaña might become worse, and as there is not yet any statute in Puerto Rico, as in many States, making provision for such a contingency which authorizes the selection of an additional member of the jury, it would have been necessary to begin the trial again, to the detriment of the interests both of the People and of the defendant.

Nor did Attorney Lastra act improperly when, in answer to a question from the court, he replied that the jury had been finally sworn. It was then that the following incident occurred:

"The court: Will attorney Lastra sit down in his place? The court desires attorney Lastra to sit down in his place.

"Attorney Lastra: My answer to the court is that I do not sit down *because I do not feel like sitting down,* meaning no disrespect.

"The court: The court orders you to sit down.

"Attorney Lastra: Well, I refuse.

"The court: The court fines you $5 for contempt. Attorney Lastra, sit down.

"Attorney Lastra: I will not sit down."

A magistrate who presides a court of justice, while in the performance of the duties of his office, represents the majesty of the law, and no matter who at such moment acts as a minister of the law he is entitled to the deepest respect, not only on the part of the public who are present at the proceedings but also on the part of the attorneys who intervene therein. It seems proper to transcribe here the quotation from *Dodge* v. *State,* 140 Ind. 284, 39 N.E. 745, 746, made with approval in *Ex parte Grossman,* 293 Pac. (Cal.) 683, 685, as follows:

". . . . : 'It is always to be regretted that a case should arise that renders it necessary for a court to inflict punishment for contempt against a member of its bar. Attorneys at the bar are properly termed the "court's constituency," to aid it in the due administration of justice. Each one is required to take an oath that he will honestly and faithfully discharge the duties as such attorney, and one of the cardinal duties enjoined upon him by law is to maintain the respect that is due to the courts of justice and justice officers. . . . . In the determination of the question as to whether a contempt has been committed, it does not depend upon the intention of the offending party, but upon the act he has done. A disclaimer of intentional disrespect or design to embarrass the administration of justice is no excuse for the person charged with the offense, when the contrary appears, from a fair interpretation of the language used. It is the imperative duty of

an attorney to respectfully yield to the ruling and decisions of the court, whether right or wrong, reserving the rights of his client by proper and necessary exceptions thereto. A remedy for the correction of the court's errors, if any, is fully provided by law.' ''

Similar words were used by the Circuit Court of Appeals, Second Circuit, in *U. S.* v. *Lanes,* 97 F. (2d) 378, 381, and by the District Court of Appeals, Third District, of California, in *Platnauer* v. *Superior Court,* 163 Pac. 237, 241.

In *Dodge* v. *State, supra,* it was also said that the fact that the language of the judge was provoking or rude is no justification for the attorney to disobey the court. The reason is that contempt is not committed against the person of the judge but against the high ministry represented by him.

We have carefully examined the cases cited in the briefs and in the opinion of the court supporting the judgment appealed from and in none of them is there a denial of the right of a judge presiding a court to order an attorney standing up in court to sit down, provided he is not at that moment performing in behalf of his client any professional act requiring or justifying his standing up while performing the same.

In the case at bar, Attorney Lastra was not performing any act justifying his disobedience of the order of the court. No witness was being examined, he was not arguing before the court or taking any exception. He himself stated that he would not take a seat simply because he had no desire to sit down, and three times in succession he disobeyed the order of the court to that effect. It is true that in the cases examined by us the order of the court to the attorney to take his seat in court was generally for the purpose of putting an end to an alleged disorderly conduct on the part of the attorney; but this does not mean that a justice who is presiding a court of justice is without authority to order to his seat an attorney who unnecessarily though in an orderly manner is standing at the bar or anywhere else in the court

room, and it is not a prerequisite of the validity of such order that a necessity should arise in justification thereof.

*Ex parte Shortridge,* 90 Pac. 478, on which counsel for appellee lays great stress, is not applicable to the case under consideration. In the above case an attorney for one of the parties was sentenced to twenty-four hours imprisonment for contempt. In the order of commitment it was stated that during the examination of a witness, the attorney in question, after he was repeatedly requested to take his seat and to refrain from interrumpting the proceedings, refused to obey the order of the court. It was not stated, however, what the alleged interruption consisted in. He filed an habeas corpus petition in the Court of Appeal for the First District of California and the judgment for contempt was set aside upon the insufficiency of the order of commitment. The court held that the acts constituting contempt should appear from the order of commitment, for, as the offense involved was of a criminal nature, both the charge and the finding and judgment of the court must be strictly construed in favor of the accused. It was further held that as there was therein involved an attorney who in that moment was engaged in defending his client, it can not be presumed that every interruption of the court constituted contempt, since by reason of his profession an attorney must frequently interrupt the court, whether for examining a witness or objecting to a question put to him, or for filing an exception or any other plea in the defense of the interests entrusted to his care. In such cases, so long as he acts with due respect, his conduct is perfectly lawful and as it is his duty to stand up when addressing the court, precisely in token of respect for the court, it is evident that a refusal to be seated under the circumstances can not constitute contempt.

In the case at bar the order of commitment literally transcribes the regrettable incident in such manner that the facts considered by the court as constituting contempt clearly appears therefrom.

548

The case of *Shortridge, supra,* also differs from the one under consideration in that in the latter the attorney was not performing any of the acts above mentioned that might justify the necessity of standing up, notwithstanding the court's request.

Another case also strongly relied upon by appellee is that of *Ex parte Crenshaw,* 31 A.L.R. 1181 (Tex. Crim. Rep.). The facts of this latter case may be summed up as follows: A trial was being held in a criminal case in which Crenshaw was the accused's counsel. During a discussion between the prosecution and the defense about the admissibility of certain evidence, attorney for the defendant referred to the decision of a similar question by the Court of Appeal in reversing a former judgment and granting a new trial. The judge, in the presence of the jury, made certain remarks tending to discredit the finding of the higher court. Crenshaw, in defense of the interests of his client, rose to take exception to the commentary made by the judge in the presence of the jury. The latter ordered him to be seated. The attorney refused to obey and stated that it was necessary for him to stand up so as to state an exception. The court punished him for contempt. Crenshaw filed an habeas corpus petition in the Court of Criminal Appeals of Texas and the judgment was vacated by the appellate court on the ground that the petitioner, as counsel, had the inviolable right to state his exception to the commentaries made by the trial court in the presence of the jury, and that in availing himself of such right, that is, in addressing the court to state his exception it was his duty to stand up. Therefore, his behavior, quite lawful, could not constitute contempt.

At the close of the opinion in the *Crenshaw* case, *supra,* as if to dispel any doubt that might arise from the language used in the opinion, the following explanation was given:

"We would not be understood as holding that contempt might not arise from the statement of continuous frivolous objections,

amounting to an obstruction of the orderly progress of a trial, *or that if, after having accomplished that which is deemed duteous, viz., the statement of his exception, counsel remain standing after a request to be seated, in a manner such as to affront the court, that these might not be contemptuous;* but we do not think relator's conduct falls in either class.'' (Italics ours.)

In the case of *Platnauer* v. *Superior Court, supra,* petitioner was the chief counsel for defendant in a case which was being tried. A discussion arose between petitioner and the court about certain evidence, and finally the court told Platnauer that the point had been settled and ordered him to sit down. Platnauer asked for leave to address the court and the latter answered that it did not desire to hear him. The attorney refused to be seated and the court, with the help of the sheriff forced him to sit down. The court then told him that he was a nuisance at the trial and that he would not be allowed to continue participating in the case. The case was proceeded with and shortly after Attorney Platnauer addressed the court to make a suggestion in connection with certain evidence that was being submitted. The court again ordered him to be seated, whereupon the attorney alleged that he had been engaged to represent his client and that he was entitled to so represent him. The court said that the conduct of Planauer was unbecoming as an attorney, declared him to be guilty of contempt and committed him to jail for one day. In order to review the judgment for contempt he filed a certiorari petition in the District Court of Appeals, Third District, California. The Court of Appeals stated the issue as follows:

''It follows, then, that the whole controversy here reduces itself down to the single and simple question whether it is within the lawful power of the court to deny and foreclose the right of a regularly licensed attorney, regularly employed by a litigant to represent him in the trial of a case, to participate in such trial, even though such attorney might at some time in the progress of the trial of the cause have been guilty of contumacious conduct, and to

550

punish him as for contempt of court if he attempts actively to represent his client in the trial." (P. 241.)

The issue thus stated was decided by the court in the following terms:

"It does not appear from the facts as they are here disclosed that the petitioner at any time addressed the court in disrespectful language. On the contrary, he appears to have proceeded with full consciousness of the duty which an attorney owes to a court, and, when adjudged guilty of contempt, had merely interposed a suggestion in respectful language as to the absence of a showing that the ballots were in the same condition in which they had been received. He was within his rights as an attorney when making this suggestion and in objecting to their consideration until such a showing had been made, even though the objection might have been legally untenable and, as a matter of fact, without foundation, which latter proposition was probably true. But the court appears to have been relentlessly insistent on compliance with its order that the petitioner should not take any active part in the trial of the case or under any circumstances to address the court; and, as declared, it was alone the persistence of the petitioner to be heard in behalf of his client, of whom he was the senior counsel, which brought forth the judgment and commitment for contempt. In other words, the alleged contemptuous conduct on the part of the petitioner appears to have consisted entirely in the petitioner's attempt to take part in the pending proceedings after the court had ordered that he should not further participate therein. As above indicated, our conclusion is that in so acting the court transcended its lawful authority, and that the order was wholly beyond the jurisdiction of the court and is, therefore, void."

In *Curran* v. *Superior Court*, (Cal.) 236 Pac. 975, decided by the District Court of Appeals, First District, California, the issue involved was the same as in the *Platnauer* case, *supra*. The attorney stated an exception and the court ordered him to sit down and to conduct the cross-examination while sitting. The attorney refused to be seated and conducted the examination standing. It was held that the examination of a witness requires an attorney to get close to him, there being added: "No reason appears from the

record for the order of the court requiring the petitioner to seat himself and conduct the examination from that position. It has always been assumed that the orderly conduct of a trial permits, if not requires, counsel in presenting his case, whether directly to the court or jury, or indirectly to them through the examination of witnesses, to stand, if only as a mark of respect; indeed, the effective cross-examination of witnesses has been shown by experience to require that he do so; and we think that in the premises the order of the court was unconsciously in excess of its proper authority; that it was due to a momentary forgetfulness of the rights of the petitioner as an officer of the court in the discharge of his duty to his client and to the public, and was not made necessary or proper by any previous act or misconduct on the part of petitioner.''

The phrase ''No reason appears from the record for the order of the court requiring the petitioner to seat himself and conduct the examination from that position'', contained in the foregoing quotation, should not be construed by itself but in connection with the context of the paragraph in which the same appears and which shows that the meaning of said phrase is that no reason existed to justify the court in depriving the petitioner of the right conferred on him as an attorney to conduct while standing the examination of a witness. We have already seen that where an attorney respectfully avails himself of his inviolable right to address the court in behalf of his client, it is his duty, as well as his right, to do so standing up and that the court can not deprive him of such right in the absence of circumstances justifying it.

In *U. S.* v. *Landes, supra,* the attorney was ordered to take his seat, and although he was discharging his duties towards his client, the judgment for contempt imposed on him because he disobeyed the order was sustained, on the ground that he was performing his professional duty in a disrespectful manner towards the court.

There is no doubt in our mind that the district court did not abuse its power by ordering the appellee to take his seat in the bar, just as it might have ordered any person standing up in the space reserved for the public to sit down. This power is included within the inherent authority of every court of justice to enforce order and decorum in the proceedings conducted by it. As the order was unquestionably a lawful one, even assuming that at the moment of being issued it was not necessary for the appellee to be seated, even then, we say again, as it was an order made with jurisdiction, it was appellee's duty to obey the same without stopping to question whether or not the circumstances at the time required it to be obeyed.

Of more serious import than the fact of having refused to sit down is, in our opinion, the language used by the attorney in answer to the request of the court, to wit: "My answer to the court is that I do not sit down because I do not feel like sitting down, meaning no disrespect." Such language is, to our judgment, defiant and provoking, and the judge had no other alternative, for the sake of the prestige of the court which he was presiding, than to punish the appellee for contempt.

In *Ex parte Halliman,* 14 Pac. (2d) 797, 799, it is said:

"Under all the authorities it is held that a contempt may be shown either by language or behavior, and that although the language itself may not be contemptuous, it may become so if uttered in an insolent or defiant manner; and in determining whether the language used was a contempt, regard must be had not only to the very words used but to the surrounding circumstances, the connections in which they were used, the tone, the look, the manner, and the emphasis."

Referring to the attitude to be assumed by appellate courts in reviewing judgments for contempt, in *Ex parte Halliman, supra,* quotation is made with approval of the following language from the Supreme Court of Minnesota:

"While we have jurisdiction to review an order punishing for a criminal contempt the decision of the court making it is not to be

lightly reversed. The opportunity of the court, in whose presence an alleged contempt is committed, to know and determine whether the acts or words were done or said in disregard and contempt of its authority is vastly greater than we can have from merely reading the record of such acts or words. Acts or words, when stated in writing, may appear to have been entirely innocent, but may have been done or spoken in such a manner as to have been in the highest degree a breach of the respectful conduct due to courts when in the discharge of their duty, and of the decorum and good order that ought to be observed in their presence to enable them to properly perform their functions. For this reason we do not think we state the rule too strongly when we say that an order adjudging a criminal contempt ought not to be reversed unless it is so apparent that no contempt was committed as to indicate that the court exercised its authority capriciously, oppressively and arbitrarily.''

 The argument based on the privilege against arrest enjoyed by petitioner as a member of the Senate of Puerto Rico, does not deserve serious consideration, for, as appellee admits in his brief, such privilege has been construed as applying to arrests in civil cases only and not to those that might be made in criminal cases. See the cases, cited by appellee, of *Williamson* v. *U. S.*, 207 U. S. 425, and *Ex parte Emmett*, 7 Pac. (2d) 1096.

Besides, the power of courts to punish for contempt is inherent in them. It has not been conferred on them by either the constitution or by legislative authority. Therefore, although the legislature has no authority to take away such power of the courts, it may regulate the same. 3 Cornell Law Quarterly 47, 48. Therefore, section 2 of the Act defining the privileges and immunities of members of the Legislative Assembly, as amended by section 34 of 1915, invoked by appellee, would be to all intents unconstitutional if we construed the same in the sense of depriving a court of justice of its powers to enforce an order of commitment for contempt committed in its immediate presence by a member of the legislative assembly during the legislative period or during the fifteen days prior or subsequent to said period.

554

Therefore, the judgment rendered by Mr. Justice Travieso on March 7, 1939, should be reversed and another rendered instead, dismissing the habeas corpus petition and remanding the prisoner to the custody of the warden of the District Court of San Juan; but in consideration of the fact that this court has noticed that in the cases herein examined similar to the instant case the sentence imposed usually has not exceeded twenty-four hours in prison, this court considers proper to call the attention of the trial judge who was treated with contempt in case he deemed it proper, in the exercise of his discretion, to modify his sentence in this sense.

Mr. Justice Travieso took no part in the decision of this case.